**TODD D., by next friends ROBERT D., Patricia D., Plaintiffs–Appellants,**

v.

**Elizabeth ANDREWS, et al., Defendants–Appellees.**

**No. 90–8652.**

United States Court of Appeals, Eleventh Circuit.

June 24, 1991.

---

Robin Spencer Nash, Warner McGinn & Nash, Mary Margaret Oliver, Decatur, Ga., for plaintiffs-appellants.

Charles L. Weatherly, Weekes & Candler, Julia Johnson Jennings, Decatur, Ga.,

Carol A. Gallaway, State Law Dept., Atlanta, Ga., for defendants-appellees.

Before JOHNSON and COX, Circuit Judges, and GODBOLD, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This case arises on appeal from the district court's award of judgment in favor of the defendant state and local educational authorities and its dismissal of the claim of the plaintiff handicapped student brought under the Education for All Handicapped Children Act, 20 U.S.C.A. §§ 1400–1485 (West 1990 & Supp.1991). The plaintiff student appeals, claiming that he is being denied an appropriate education in accordance with his current individualized education program. The defendant local educational authority cross-appeals the district court's denial of its prayer for injunctive relief and declaratory judgment that the state educational authority, rather than the local one, is ultimately responsible for providing the plaintiff with an appropriate education.

## I. BACKGROUND OF THE CASE

Todd D. is a chronic schizophrenic with borderline intellectual functioning. His disability is defined as a severe emotional disturbance by the Education for All Handicapped Children Act ("EHA") and entitles him to receive a free appropriate education suited to his needs. He and his family are residents of DeKalb County, Georgia. In accordance with the EHA, the DeKalb County School District is the Local Educational Authority ("LEA") charged with creating and implementing for Todd an Individualized Education Program ("IEP"). Under his IEP, Todd initially attended elementary school in DeKalb County and received special instruction. At the age of ten, his behavioral problems increased, and he was consequently hospitalized at the Georgia Mental Health Institute from 1980 to 1982. He then returned to the DeKalb County system where he received instruction in a day program for the severely emotionally disturbed. In 1986, it was decided that he could no longer attend the day program because of episodes of aggressive behavior. In November 1986, he was sent to a residential program in Florida under an IEP specifying residential services. After a visit home in April 1987, it became apparent to the D. family that Todd was not receiving basic care.[1] The family also suspected that Todd was being abused. They consequently refused to allow him to return to the Florida facility. The LEA, however, was unable to find an appropriate residential facility for Todd in Georgia. Todd therefore attended a day program in the community until May 1988 when his aggressive behavior prohibited his continuing there.

Todd D. and his parents then requested a due process hearing before a hearing officer regarding the implementation of Todd's IEP. In their view, the LEA was responsible for providing Todd services in his home community or at least in the state of

---

1. Mrs. D. testified before the district court regarding Todd's condition upon his visit home:

Q. How was Todd physically when he got off the plane? How did he appear to you physically?
A. He looked like he had escaped from a concentration camp.
Q. How much weight had he lost while at Montanari?
A. At least 65 pounds.
Q. In five months?
A. Right.
Q. What else was wrong with him physically?
A. Temperature of 104. He had some kind of virus. He was dirty. His hair had not been cut. He had not shaved. All of his clothes had been stolen and they had gone to the general store, gotten him some clothes that were about four sizes too big for him. He just looked liked (sic) death.
Q. How did he appear to you emotionally?
A. He was scared. I mean he was scared. He wanted to say the right thing no matter what it was, he was going to say it, so that something would not happen to him.
Q. Did you make a decision about whether or not he would go back to Montanari?
A. Immediately.
Q. And that decision was what?
A. He wasn't going back there.
(R2:57–58).

Georgia. In June 1988, a due process hearing was conducted. During the pendency of the administrative process, in October 1988, Todd was placed at the San Marcos Treatment Center ("San Marcos") in San Marcos, Texas, because it was the closest residential facility that would accept him. After failing to obtain relief at the administrative level, Todd and his parents filed a complaint in district court in June 1989 against the DeKalb County Board of Education, its members and superintendent, the LEA, the superintendent of the Georgia State Department of Education ("state DOE"), and the Georgia Board of Education and its members, seeking injunctive and declaratory relief. The DeKalb County defendants cross-claimed against the state defendants, claiming that if Todd's placement at San Marcos was inappropriate, the placement was due to the state's policy of refusing to provide residential services directly to handicapped students who cannot be served by their LEAs.

In accordance with the EHA, the LEA is required to prepare an IEP for Todd which sets out the objectives of his education. *See* 20 U.S.C.A. §§ 1401(a)(20), 1414(a)(5) (West 1990 & Supp.1991). Todd's current IEP was prepared in April 1989 and reeval-

uated in January 1990. The parties agree that when Todd reaches the age of 22, on August 27, 1991, the state and the LEA will no longer be responsible for Todd's education and will therefore no longer fund his stay at San Marcos. The revised IEP therefore articulated goals addressing Todd's transition back into his home community.[2] The provisions of the IEP pertinent to this litigation involve the goal of transition:

(1) Residential:

a) Todd will transition (sic) into a residential/educational facility in his home community where continued work on the IEP goals will be carried out;

(2) Vocational/Educational:

a) Todd will enroll in and participate in a community-based sheltered workshop program a minimum of 1 hr. daily to a maximum of 6 hrs. daily;

b) Todd will continue to decrease inappropriate behaviors that interfere w/successful vocational programming;

(3) Community/Family:

a) Todd will develop a supportive relationship with his family that will encourage him to be independent from his family;

---

**2.** In establishing transition goals in Todd's IEP, his IEP team merely anticipated the current statutory requirements of the EHA. On October 30, 1990, Congress amended the EHA to require that each IEP contain a statement of needed transition services for students beginning no later than age 16. *See* 20 U.S.C.A. § 1401(a)(20)(D) (West Supp.1991). The amendment defines "transition services" in section 1401(a)(19):

(19) The term "transition services" means a coordinated set of activities for a student, designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation. The coordinated set of activities shall be based upon the individual student's needs, taking into account the student's preferences and interests, and shall include instruction, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

The legislative history to these amendments indicates that Congress recognized that special education students "move from school to adult life with varying degrees of success." H.R.Rep. No. 101–544, 101st Cong., 2d Sess. 9, *reprinted in* 1990 U.S.Code Cong. & Admin. News 1723, 1731. Congress noted that when individuals are not prepared to make the transition into the nonschool environment "[y]ears of special education will be wasted while these individuals languish at home, their ability to become independent and self-sufficient (therefore making a positive contribution to society) placed at significant risk." *Id.* Congress set the outside age limit for beginning transition goals at age 16 because it recognized that a large number of special education students drop out of school before age 18. Those who remain will, of course, eventually "age out" of school programs, and for them years of transition preparation may be needed to accommodate their movement into adulthood. *Id.* at 1732–33. *See also* 20 U.S.C.A. § 1412(2)(B) (West 1990 & Supp. 1991) (basing eligibility to receive benefits under the EHA on age).

b) Todd will have successful visits with his family in Texas and in Georgia in preparing for return to his home community;

c) Todd will participate in ongoing family therapy working toward a transition to his home community.

(R1:1:29).

Todd's transition date was set for February 1990. At the January 1990 reevaluation of Todd's IEP, however, that date was postponed. It was determined at that reevaluation meeting that the transition goals, though appropriate for Todd, could not be implemented. The impediment to making progress toward these transition goals was the fact that a facility in Todd's home community, or even in the state of Georgia, to which he might transfer and at which he might obtain aid in meeting the goals, could not be identified.

In May 1990, the district court rendered its decision, stating that "[b]ecause Todd can receive sufficient educational benefits in a facility outside his home community, the court finds that Todd's placement at SMTC [San Marcos Treatment Center], if the necessary changes in his individual educational program are made, does not deprive him of his right to an appropriate education." (R1:23:23). Todd, his family, and the DeKalb defendants now appeal.

## II. ANALYSIS

### A. *Appropriate Education*

■ "[A] court's inquiry in suits brought under [the EHA] is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Board of*

*Educ. of Hendrick Hudson Cent. School Dist. v. Rowley*, 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982) (footnote omitted). The parties agree that this case does not involve the first prong of *Rowley*, but concerns only the second.

Under *Rowley*, the EHA does not require that the educational services offered by the state maximize the child's potential. *Id.* at 199, 102 S.Ct. at 3047. The EHA guarantees the child only a "basic floor of opportunity," *i.e.*, education which confers some benefit. *Id.* at 200–01, 102 S.Ct. at 3047–48. The approach taken by the district court was to note that Todd was receiving some benefit from his placement at San Marcos. Experts testified that he had, in fact, made great progress since he first came there. Though those supervising his treatment believed that he had gained as much as he could from the San Marcos facility, they admitted that if he stayed he would continue to make some progress toward some of his IEP goals. It was clear, however, that Todd could not achieve his goal of transition into the DeKalb County community as long as he remained at such a long distance from his home. He could, however, make some progress toward transition in general, *i.e.*, he could do some vocational work in the San Marcos community and he could be less supervised in his activities in general. These steps would presumably encourage him toward independence. By stating that "Todd's placement in SMTC, *if the necessary changes in his individualized educational program are made*, does not deprive him of his right to an appropriate education," the district court essentially concluded that Georgia's obligations under the EHA should be met by altering the transition goals of the IEP rather than by altering Todd's placement. In this way, the transition goals as stated in the altered version of the IEP could be achieved at San Marcos.[3] There are two

---

3. When Todd originally began the administrative hearing process in May 1988, DeKalb County as LEA took the position that placement at San Marcos was appropriate for achievement of the IEP goals. When those goals were reevaluated at the IEP meeting in January 1990, De-Kalb County changed its position in light of the enhanced educational need to prepare Todd for transition into his community. The state DOE was not involved in the development of the IEP. Though the state supports the district court's determination, it apparently did not argue until

difficulties with the district court's approach.

First, the district court must pay great deference to the educators who develop the IEP. The EHA requires that the handicapped child's IEP be developed in consultation with the child's teacher, the child's parents, and LEA representatives. *See* 20 U.S.C.A. § 1401(a)(20) (West Supp.1991); *Doe v. Alabama State Dep't of Educ.*, 915 F.2d 651, 654 (11th Cir.1990). In the statutory scheme, the IEP is "more than a mere exercise in public relations. It forms the basis for the handicapped child's entitlement to an individualized and appropriate education." *Doe*, 915 F.2d at 654. "In the face of such a clear statutory directive, it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to § 1415(e)(2)."[4] *Rowley*, 458 U.S. at 207–08, 102 S.Ct. at 3051. "[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Id.* at 208, 102 S.Ct. at 3052. Todd's IEP team set particular goals it believed were appropriate for him. The district court's holding requires that the IEP team change those goals. The district court has thus substituted its choice of educational theories and methods for that of the local authorities. Though the district court is correct in stating that the EHA does not require maximization of Todd's potential, Todd's IEP as presently written does not necessarily represent maximization, but only the goals the IEP team determined were appropriate for Todd. By requiring the IEP to be rewrit-

ten, the district court has overstepped its role.

■ Second, it is clear that the " 'basic floor of opportunity' provided by the [EHA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048. Thus, the "State is responsible for meeting a child's *unique* educational needs." *Georgia Ass'n of Retarded Citizens v. McDaniel*, 716 F.2d 1565, 1570 (11th Cir.1983) (emphasis in original), *vacated on other grounds*, 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1984), *adopted and modified on other grounds*, 740 F.2d 902 (1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1985). In reaching its holding, the district court stated:

> the court is mindful of the unavoidable effect of an opposite result. If this court were to agree with the plaintiffs' contention that the EHA requires the defendants to provide Todd with an educational placement in his home community capable of implementing a discharge program, the court would be placing on the defendants the obligation to establish facilities in every community of Georgia in which a handicapped child preparing for discharge resides.[5] The court is not prepared to reach such a conclusion, nor does the court believe that the EHA, which grants states and LEAs the authority to provide educational services through tuition grants and out-of-state placements, requires the court to do so under these circumstances.

(R1:23:23–24). In making this statement, the court has admitted that its decision to

---

this appeal that the IEP was inappropriate or should be altered.

**4.** The case at bar is a § 1415(e)(2) proceeding.

**5.** The court erred in its characterization of Todd's IEP as requiring residential placement in his home community. The expert testimony before the district court indicated that the transition goals of the IEP could be met if Todd were placed at a facility located in proximity to his home, close enough to allow him to visit the places to which he is to make transition. This does not necessarily mean that the facility must be within DeKalb County. At oral argument,

the parties stated that a suitable residential facility already exists in Columbus, Georgia, some ninety miles from Todd's home. Apparently, Todd was not placed there initially for two reasons. First, the Department of Human Resources (DHR), rather than the state DOE, runs the facility, and the state DOE does not currently have an agreement with DHR which would allow Todd to be placed there. Second, the Columbus facility currently serves children who are under the age of sixteen, and Todd has already passed the age of sixteen.

rewrite Todd's IEP was not based on its attention to Todd's individual needs, but on its attention to the state's existing policy of placing handicapped children who require residential programs in out-of-state facilities instead of creating in-state programs. This approach is clearly not in line with EHA's requirement that each handicapped child's IEP be crafted to meet that child's individual needs. Consequently, we hold that the district court erred in finding that Todd's current IEP need not be implemented as written. Todd must therefore be placed at a facility close enough to his home community to allow implementation of his transition goals.[6]

### B. State's Obligation to Provide Services Directly to Todd D.

■ The DeKalb County defendants cross-claimed against the state DOE in the action below, claiming that if Todd's placement in Texas was found inappropriate, the placement was due to the state's policy of refusing to provide direct services to a student who cannot be served by an LEA. Because the district court found Todd's placement appropriate, it did not reach this issue.

Sections 1414(d)(1) & (3) of the EHA require that a state educational agency provide special education and related services directly to the children of an LEA if it is found that the LEA "is unable or unwilling to establish and maintain programs of free appropriate public education" or when that LEA "has one or more handicapped children who can best be served by a regional or State center designed to meet the needs of such children." A component of the congressional scheme for the delivery of services is the development of interagency agreements between state educational agencies and other state agencies. *See* 20 U.S.C.A. § 1413(a)(13) (West 1990 & Supp. 1991). According to the DeKalb County defendants, because the state DOE and the LEAs in Georgia do not operate residential facilities for the emotionally handicapped, the state entered into an agreement with the Department of Human Resources (DHR) for the purpose of fulfilling its obligation to provide residential services. This agreement apparently allowed the LEAs to refer children to DHR for placement in residential facilities.[7] Testimony before the district court, however, indicated that DHR refused in some instances to accept these referrals. The state DOE, according to DeKalb County, did not attempt to enforce the agreement, but instead amended the agreement in 1987 to place responsibility for the provision of such residential services on the LEAs. The effect of the amendment was to force LEAs to place individuals such as Todd in out-of-state facilities; the state eased the financial burden of such placements through a tuition-grant program.[8] DeKalb County claims that the confluence of the amendment and the tuition-grant program results in a state policy of not providing direct services to children such as Todd in violation of the state's obligation under EHA.

A group of Georgia LEAs, including DeKalb County, raised this very issue in *Andrews v. Ledbetter*, 880 F.2d 1287 (11th

---

6. Todd also argues that placement at San Marcos violates the requirement that Todd be placed in the "least restrictive environment." Under 34 C.F.R. § 300.552 (1989), the agency placing the handicapped child is required to place the child in the least restrictive educational environment possible. In determining the least restrictive environment, the agency is required to consider the proximity of the facility to the child's home. According to the comments to this section, when "[a]n equally appropriate education program ... exist[s] closer to home," that program is considered the least restrictive. It is clear from these comments, however, that the obligation on the agency is to consider proximity as one factor, rather than necessarily to place the child close to home. Because the San Marcos facility is currently the closest residential facility open to Todd, the obligation to consider this factor under the "least restrictive environment" requirement has been fulfilled. The district court was correct in so holding.

7. Though the transcript of trial testimony regarding this agreement is contained in the appellate record before us, the agreement itself is not.

8. In Todd's case, the state pays 43% of the cost of his stay at San Marcos. The LEA pays the remaining 57%. The parties stipulated that the annual cost of Todd's placement at San Marcos is approximately $188,000.

Cir.1989).[9] In *Andrews*, we held that the LEAs had no statutory right to sue the state DOE under EHA. We stated, however, "In this case, no LEA is challenged by a handicapped child, or his parent or guardian, for failing to provide a free appropriate public education. Should such a case arise, it may be that the LEA may defend by asserting that the state educational agency is primarily and ultimately responsible for the Act's implementation. *See* § 1412(6); § 1414(d). Of course, the resolution of such an issue awaits an appropriate case." *Id.* Clearly, this is the "appropriate case."

There is no doubt that under section 1414(d) of the EHA, quoted above, the state DOE retains the ultimate responsibility for providing eligible students with an appropriate education when the LEA is "unable or unwilling" to do so. The district court in its order stated that DeKalb County did not operate residential facilities appropriate for Todd and that DeKalb had been unable to find an appropriate facility within the State of Georgia which would admit him. But because the district court found San Marcos to be an appropriate placement for Todd, a holding which we find in error, it did not make factual findings as to the ultimate ability or inability or the willingness or unwillingness of DeKalb County to provide these services.[10] Likewise, the district court made no findings relevant to section 1414(d)(3) as to the number of children with handicaps similar to Todd's who might "best be served by a regional or State center designed to meet the needs of such children." *See* 20 U.S. C.A. § 1414(d)(3) (West 1990 & Supp.1991). The district court, in fact, limited the scope of the case by refusing to hear evidence as to other children from DeKalb County who,

like Todd, may have been inappropriately served. (R4:79–80).[11]

The law is clear that if the DeKalb LEA is unable or unwilling to serve Todd the state DOE must do so. *See Honig v. Doe*, 484 U.S. 305, 329, 108 S.Ct. 592, 607, 98 L.Ed.2d 686 (1988) (affirming by an equally divided Court the Ninth Circuit's holding that the federal court may order a state to provide services directly to a handicapped student under section 1414(d) where the LEA has refused to do so); *Georgia Ass'n of Retarded Citizens v. McDaniel*, 511 F.Supp. 1263 (N.D.Ga.1981) (holding that section 1414(d) places responsibility on the state educational agency either to ensure that the LEA provides services or to provide services directly to the student itself), *aff'd*, 716 F.2d 1565 (11th Cir.1983), *vacated on other grounds*, 468 U.S. 1213, 104 S.Ct. 3581, 82 L.Ed.2d 880 (1984), *adopted and modified on other grounds*, 740 F.2d 902 (1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1228, 84 L.Ed.2d 365 (1985). Similarly, if Todd is better served by a regional or state facility than a local one, the state DOE must take responsibility for him. *Doe by Gonzales v. Maher*, 793 F.2d 1470, 1492 (9th Cir.1986), *aff'd sub nom. Honig v. Doe*, 484 U.S. 305, 329, 108 S.Ct. 592, 607, 98 L.Ed.2d 686 (1988). However, "[w]hen an appellate court discerns that a district court failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Pullman–Standard v. Swint*, 456 U.S. 273, 291, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982). We must therefore remand to the district court for specific findings on this issue.

---

**9.** According to DeKalb County, Todd attempted to intervene in *Andrews* in May 1988 prior to beginning administrative hearings. The district court, however, refused him permission.

**10.** Dr. Jane Jordan, director for the division of exceptional students at the state DOE, testified at trial that if DeKalb County was declared unable to serve Todd, the legal burden for serving Todd would shift to the state DOE under the state plan. However, a determination would have to be made that the LEA was unable to

serve. Though she admitted that she had never opposed an LEA's decision that it was unable to serve, her position was that a determination as to DeKalb's ability to serve had not been made in Todd's case. (R4:7–10).

**11.** Testimony was admitted, however, that there are forty-three to forty-six severely emotionally disturbed students from Georgia who are, like Todd, being served at out-of-state private psychiatric institutions. (R4:18).

### C. *Compensatory Education*

[5] At oral argument, Todd D. requested that we award him compensatory education for the years he has been inappropriately placed.[12] When an aggrieved party seeks relief in federal court under a section 1415(e)(1) proceeding, the court clearly may award whatever relief "[i]t determines is appropriate" under section 1415(e)(2). *See Lester H. By. Octavia P. v. Gilhool,* 916 F.2d 865, 872 (3d Cir.1990) (explaining relief of compensatory education), *cert. denied,* — U.S. ——, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991). This Circuit has held compensatory education appropriate relief where responsible authorities have failed to provide a handicapped student with an appropriate education as required by the EHA. *Jefferson County Bd. of Educ. v. Breen,* 853 F.2d 853, 857 (11th Cir.1988). We are well aware that Todd D. will soon "age out" of eligibility to receive free appropriate public education under the EHA. An award of compensatory education is therefore highly appropriate relief. We thus additionally remand to the district court for award of compensatory education and determination of the length of time for which compensatory education is due.

### III. CONCLUSION

We REVERSE the district court's holding that Todd need not be placed in a facility in proximity to his home community and REMAND the case for immediate proceedings not inconsistent with this opinion.

---

12. We note that this issue was also raised before the district court in the general prayer for relief in Todd's original complaint in which he requested "all other and further relief as this Court deems proper." The district court, of course, had no reason to address the issue of compensatory education inasmuch as it ruled against Todd on the underlying issues.