**CHRIS C., By his next friend BARBARA C. and Barbara C., in her personal capacity, Plaintiffs,**

v.

**GWINNETT COUNTY SCHOOL DISTRICT, Defendant.**

No. 1:90–cv–343–RHH.

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 22, 1991.

Charles Anthony Presto, Atlanta, Ga., Brian Andrew Prince, Watkinsville, Ga., for plaintiffs.

Frank C. Bedinger, III, Alan Robert Heath, Freeman & Hawkins, Atlanta, Ga., for defendant.

## ORDER

ROBERT H. HALL, Jr., District Judge.

This is a case brought pursuant to the Education of the Handicapped Act, 20 U.S.C. § 1400 *et seq.*, concerning the proper placement of Plaintiff Chris C., a disabled child, in the educational system provided by Defendant Gwinnett County School District. Following regional and state hearings on the matter as provided for by 20 U.S.C. § 1415(b) and (c), Plaintiffs commenced the present action in this Court. Jurisdiction is vested with this Court pursuant to 20 U.S.C. § 1415(e)(2). A non-jury trial was held July 9 and 10, 1991, pursuant to which the Court issues the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1.

Plaintiff Chris C. ("Chris") is a sixteen-year-old male child who was born with Down's Syndrome.

2.

Plaintiff Barbara C. ("Plaintiff") is Chris' mother.

3.

Chris is currently enrolled in the mildly mentally handicapped program at Summerour Middle School within the Defendant Gwinnett County School District ("Defendant", "Gwinnett County").

4.

In September 1977, when Chris was approximately two years old, he entered the early childhood program at Coral Wood in the DeKalb County School System. At that time, DeKalb County offered the best

early intervention services for disabled children in the state of Georgia. Chris remained in the DeKalb County special education program until the fall of 1982.

5.

In the fall of 1982, when Chris was approximately seven years old, directors of the DeKalb County special education program recommended that Chris be placed in a diagnostic, pre-primary learning disabilities/educable special education class. When Plaintiff refused to consent to this recommended placement, Chris was placed in a kindergarten class for nonhandicapped students.

6.

In May 1983, when Chris was almost eight years old and had been in DeKalb County's mainstream kindergarten program for approximately one year, directors of the DeKalb County special education program recommended that Chris be placed in their general learning disabilities/trainable program. Plaintiff again refused special education placement, and withdrew Chris from the DeKalb County school system and enrolled him in a private school.

7.

Chris attended private Christian schools from 1983 until 1987, where he received no special education services.

8.

In 1987, when Chris was approximately twelve years old, his family moved to Gwinnett County. Chris was enrolled in the Gwinnett County School System in the sixth grade, and was placed in the self-contained class for the mildly mentally handicapped at Pickneyville Elementary School.

9.

The following year, in 1988, Chris was placed in Defendant's self-contained class for the mildly mentally handicapped at Summerour Middle School, where he is currently enrolled.

10.

At issue in this case are two distinct placement programs available to disabled students enrolled in the Gwinnett County school system: the program for the mildly mentally handicapped ("MIMH program", "mild program"), and the program for the moderately mentally handicapped ("MOMH program", "moderate program"). Although the school system also offers a program for the severely mentally handicapped, that program is not at issue in this case.

11.

Educational services provided a student in the MIMH and the MOMH programs differ considerably. Classroom instruction in the MIMH program focuses upon greater academic achievement, and upon everyday "survival skills" (i.e., renting an apartment, comparison price shopping, etc.) which are more advanced and require more independence on the part of the individual students. In contrast, the MOMH program provides classroom instruction in only basic "survival academics" (i.e., telling time, counting money, etc.). When a student in the MOMH program has mastered these tasks, he is placed in a work-study program wherein he actually goes out and learns very basic "survival skills" (i.e., how to apply for and keep a job, how to get along with others, etc.) by actually going out and working a certain number of hours per day. Thus, the MOMH student presumably graduates from high school with a working resume and, hopefully, some prospects for future permanent employment with the organizations in which he previously held work-study positions.

12.

In sum, the MIMH program offers more academic and less day-to-day survival instruction, whereas the MOMH program offers less academic and more day-to-day survival/job- and self-sufficiency-related instruction. The theory underlying this system of instruction is that the unique needs of students with a greater degree of handicap require a different instructional approach, and dictate a different optimal educational ending point, than is the case with their less handicapped peers. The theory is based upon conclusions of experts in the field of handicapped special education, first, that the students with a greater de-

gree of handicap do not benefit from more academic instruction, and indeed become frustrated with it; and second, that it is critical, upon their graduation from high school at approximately twenty-one years of age, that the students with a greater degree of handicap be to a certain extent self-sufficient and able to perform basic survival tasks.

13.

The Georgia Department of Education Regulations and Procedures ("the State Regulations") define mildly and moderately mentally handicapped as follows:

(1) Mildly mentally handicapped (MIMH)
   (a) Intellectual functioning ranging between an upper limit of approximately 70 to a lower limit of approximately 55; and
   (b) Deficits in adaptive behavior which significantly limit an individual's effectiveness in meeting the standards of maturation, learning, personal independence of social responsibility and especially school performance that is expected of the individual's age level and cultural group, as determined by clinical judgment.

(2) Moderately mentally handicapped (MOMH)
   (a) Intellectual function ranging from an upper limit of approximately 55 to a lower limit of approximately 40; and
   (b) Deficits in adaptive behavior which significantly limit an individual's effectiveness in meeting the standards of maturation, learning, personal independence of social responsibility and especially school performance that is expected of the individual's age level and cultural group, as determined by clinical judgment.

State Regulations, IDDF, November 1, 1988, p. 51.

14.

The State Regulations further provide that when determining a student's eligibility for any of the special programs, all I.Q. scores must be interpreted as a range of scores extending one standard error of measurement above and below the actual score obtained. Thus, for the purposes of determining eligibility and placement, Chris' I.Q. scores are interpreted as a range of scores rather than a single numerical reading.

15.

The parties do not dispute that, based upon Chris' I.Q. score range alone, that is, criterion (a) above, he consistently has been diagnosed as being on the borderline between mild and moderate, as those placements are defined by the State Regulations. Specifically, Chris' I.Q. has consistently been found to be approximately 51. Thus, based upon his resulting I.Q. score range alone, Chris could reasonably be placed in either the mild program, where presumably he would function intellectually toward the lower end of the class, or the moderate program, where presumably he would function intellectually toward the upper end of the class.

16.

The parties do, however, dispute the implications of criterion (b) above on Chris' placement. Plaintiff contends that since the same requirement is provided under (b) for each placement, Chris under this criterion necessarily also could properly be placed in either program. Defendants contend that based upon their own "clinical judgment" as required by the regulation, evaluation of Chris under criterion (b) mandates his placement in the moderate, as opposed to the mild, program.

17.

In determining the proper placement of a child within its special education program, Defendant utilizes records entitled "Individual Educational Programs" ("IEPs").

18.

The IEP is basically an evaluation and planning form which is completed for each student receiving special services from Defendant. It is revised annually for each student, and is completed and signed by members of Defendant's special education placement committee (the "committee", the "placement committee"), which is composed of such specialists as Defendant's Director of Education, the child's teacher,

various coordinators of and consultants to the special education program, and the child's parents, if the parents choose to attend the committee meeting which will form the basis of their child's IEP. The IEP sets forth such information as the student's long range goals, his short term objectives, his particular strengths and weaknesses, and his present level of performance in the following areas: (1) academic; (2) social/behavioral/adaptive; (3) motor/physical; and (4) self help. Additionally, the IEP sets forth any particular tests which have been used to evaluate the child. Finally, the IEP sets forth the committee's recommendation with regard to the proper placement of the child within Defendant's special education program during the upcoming academic year.

19.

When Chris first entered the Gwinnett County system as a new student in the fall of 1987, he did not have an IEP. As a result, Defendant was without any information upon which to base a complete evaluation of Chris' particular needs.

20.

In the case of a new student, it is Defendant's practice to complete an interim IEP based upon information provided by the child's parents with regard to the child's development and needs, as well as any available results of evaluative tests previously conducted on the child. Based upon such information, the child is given an interim placement in what appears at the time to be the most appropriate program. During this interim placement, various coordinators and specialists in Defendant's special education program evaluate the child in the context of his interim placement in order to determine whether the interim placement is in fact the most desirable for the child, or whether the child would receive greater benefit from another program offered within Defendant's special education department, and should therefore be moved to that program.

21.

Chris was placed in the MIMH program pursuant to an interim IEP completed by Jeane Graves, Defendant's EMH—Self Contained Teacher, on or about September 14, 1987. In recommending interim placement in the MIMH program, Defendant relied upon a psychological evaluation of Chris conducted by the Atlanta Public School System in June 1986 and information provided by Plaintiff with regard to Chris' development, adjustment and needs. Accordingly, the placement committee submitted to Plaintiff a Parent Consent for Placement recommending placement in the mild program at Pinckneyville Middle School, which Plaintiff signed.

22.

Nevertheless, the interim IEP pursuant to which Chris was placed in the MIMH program states that it was to apply for a period of 20 days only. Furthermore, in the space provided for "Long Range Goals" is written "To evaluate and to determine appropriate placement."

23.

During the fall of 1987, Chris' first fall enrolled in the Gwinnett County system, handicapped education specialists employed by Defendant ("Defendant's specialists") became concerned about the appropriateness of Chris' interim placement in the MIMH program.

24.

As a result of their concern, Defendant's specialists in October 1987 requested permission from Plaintiff to conduct further psychological evaluations and screenings on Chris in an attempt to determine the proper placement for the child. However, Plaintiff refused to sign a Parent Consent for Screening, Evaluation and/or Re-evaluation, thus refusing permission for such screenings and evaluations. Rather, Plaintiff noted on the consent form that she would agree to any of the stated tests only on an "as needed" basis with a prior written request. However, Plaintiff subsequently refused to consent to any requested tests and/or screenings.

25.

Throughout October, November and December, 1987, Defendant's specialists collected "observational data," that is, data collected from the casual observation of

Chris' performance in the MIMH classroom in which he had been placed.

26.

Based upon this observational data, Defendant's specialists concluded that Chris was functioning on a moderate level within the mild program, and would as a result be better served by a placement in the moderate program.

27.

On December 10, 1987, Defendant's specialists prepared a Moderately Mentally Handicapped Eligibility Report (the "Eligibility Report") with regard to Chris. This report was completed and signed by a committee composed of Jeane Graves, Chris' EMH Self–Contained Teacher; Carol Quinn, Defendant's MOMH Lead Teacher; Patti Garrett, a teacher in Defendant's MOMH program; and Karen Andersen, Defendant's Associate School Psychologist.

28.

Pursuant to the Eligibility Report, the committee concluded that Chris was eligible for MOMH services. The Eligibility Report specifically states: "Christopher is currently functioning in the moderate range intellectually. Academically he is slowly making progress though on the Pre–First Grade Level. His adaptive behavior is in the Low range ..., especially in the areas of Communication and Socialization."

29.

On January 21, 1988, Defendant's placement committee met, along with Plaintiff, to discuss a change of placement for Chris. The minutes of this meeting reflect the fact that regardless of the committee's recommendation that Chris be placed in a moderate class, Plaintiff refused to consent to a change of placement, believing that the moderate program would be too restrictive for Chris, and would not expose him to a sufficient number of academic and social situations. Accordingly, upon the committee's submission to Plaintiff of a Parent Consent for Placement recommending the MOMH program at Duluth Middle School, Plaintiff refused to consent.

30.

On or about August 24, 1988, when Chris had been in the Gwinnett County system for approximately one year, Carol Quinn, along with Defendant's special education consultant, met with Plaintiff and her legal counsel to formulate a second interim IEP for Chris with regard to his proposed interim placement in the mild program at Summerour Middle School. The Placement Committee Minutes from that meeting, as well as the interim IEP itself, reflect the fact that this second interim IEP was to remain in effect for 20 days, and was to allow the committee to complete its screening process and to determine the proper placement for Chris. The interim IEP states that it was to be reviewed on September 22, 1988. Accordingly, the committee submitted to Plaintiff a Parent Consent for Chris' interim placement in the mild program at Summerour Middle School, which Plaintiff signed.

31.

On or about September 26, 1988, a committee composed of Carol Quinn, Defendant's MOMH lead teacher, Barbara Tillman, Defendant's mild program teacher, Karen Andersen, Defendant's Associate School Psychologist, and a consultant, completed a second Moderately Mentally Handicapped Eligibility Report for Chris. Again, the committee found that, based upon available test scores and current classroom performance in the mild class in which he had temporarily been placed, Chris was eligible for placement in the moderate program.

32.

Accordingly, on September 28, 1988, the committee submitted to Plaintiff a Parent Consent for Placement with regard to Chris' proposed placement in the moderate program at Duluth Middle School. Plaintiff refused to sign this consent form.

33.

On October 12, 1988, members of Defendant's special education committee met with Plaintiff and her legal representative in order to review the various data accumulated on Chris during the 1987–88 and 1988–89 school years. The minutes of that

meeting reflect the committee's recognition of a need for a new IEP in order to achieve the proper placement for Chris.

34.

On November 9, 1988, Defendant's placement committee met with Plaintiff and her legal representative in order to again discuss Chris' placement and the need for a new IEP. The minutes of that meeting reflect the fact that while the committee again recommended that Chris be placed in the moderate program, Plaintiff continued to object to this placement due to her belief that Chris would gain more social skills and would be more academically stimulated in the mild program.

35.

Pursuant to this meeting, the committee on or about November 9, 1988 completed Chris' first regular, as opposed to interim, IEP. In completing this IEP, the committee relied upon "parent/teacher/administrative observation and classroom performance", and recommended that Chris be placed in a moderately mentally handicapped self-contained class. This IEP reflects the fact that it was to remain effective for one year. Plaintiff refused to sign this IEP, and thus refused to consent to Chris' placement in the moderate program as recommended.

36.

By letter dated November 29, 1988, Dr. Richard Downey, Defendant's Director of Special Education, notified Plaintiff of Defendant's intent to implement Chris' November 11th IEP by placing him in the moderate class at Duluth Middle School. The letter further advised Plaintiff that the new placement would be initiated unless Plaintiff requested a hearing to challenge Defendant's placement decision as is allowed under 20 U.S.C. § 1415(b)(2).

37.

Plaintiff subsequently requested such a hearing pursuant to § 1415(b)(2) challenging Defendant's placement decision. Following a three-day evidentiary hearing, the regional hearing officer ruled that Defendant's MOMH program, as recommended by Defendant's placement committee, was

the appropriate placement for Chris. The regional hearing officer further found that Defendant was authorized to conduct an evaluation of Chris for educational purposes, and that Chris was ineligible for direct speech and language services.

38.

Pursuant to 20 U.S.C. § 1415(c), Plaintiff appealed the regional hearing officer's decision to a state hearing officer. Based upon his review of the regional hearing record, the state hearing officer concurred with the regional hearing officer that the MOMH program is the proper placement for Chris.

39.

Pursuant to 20 U.S.C. § 1415(e)(2), Plaintiff on or about February 14, 1990 commenced the present action in this Court.

40.

Pursuant to the EHA's "stay put" provision found in 20 U.S.C. § 1415(e)(3), Chris remains in the MIMH program, his current placement at the time the dispute arose, pending resolution of this case.

41.

Although his IEPs are revised approximately annually and indisputedly reflect goals and objectives normally implemented in a MOMH placement, Chris thus for four years has been placed in a classroom designed to implement the goals and objectives of a MIMH IEP. As a result, Chris' teacher spends much time attempting to implement Chris' MOMH goals on a one-on-one basis, while the rest of the class works on their MIMH goals. The parties do not dispute the fact that the result has been two classes: one for Chris and one for the other students in the MIMH class.

42.

During his four years of placement in the mild class, Chris has made little academic progress, and continues to function at the pre- or early primary school level both academically and socially. While his classmates in the MIMH program are on the average currently functioning at the fifth and sixth grade levels, Chris continues to function on a first or pre-first grade level. In fact, Chris is currently working

on many of the same objectives outlined for him by the Dekalb County School District in 1983, when Chris was approximately eight years old.

### 43.

Chris is consistently unable to perform the tasks performed by his classmates in the mild program.

### 44.

Students currently enrolled in Defendant's moderate program are working at a level considerably more advanced than Chris.

### 45.

Three children in the Pickneyville mild program with Chris were at one time functioning at the same level as Chris. Of those students, all three have subsequently been placed in Defendant's moderate program at Duluth High School. Moreover, all three are currently functioning, in a number of areas, at a level considerably above Chris' level.

### 46.

Due to Chris' age and size, it is appropriate that Chris matriculate to high school during the upcoming academic year. Accordingly, Plaintiff requests that Chris be placed in the MIMH class at Norcross High School, while Defendant seeks to implement its November 1988 IEP by placing Chris in the MOMH class at Duluth High School.

### CONCLUSIONS OF LAW

I. *Jurisdiction Question*

### 1.

This Court exercises jurisdiction over cases arising under the Education of the Handicapped Act, 20 U.S.C. § 1400 *et seq.* (the "EHA"), by virtue of § 1415(e)(2) of that Act.

### 2.

■ Under Article III of the United States Constitution, this Court may adjudicate only actual, ongoing controversies. *Honig v. Doe,* 484 U.S. 305, 317, 108 S.Ct. 592, 600, 98 L.Ed.2d 686 (1987); *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2796, 49 L.Ed.2d 683 (1976);

*Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). The mere fact that the dispute between the parties existed when the suit was filed is not sufficient to give this Court jurisdiction over a matter which in the meantime has become moot. *See Honig,* 484 U.S. at 317, 108 S.Ct. at 5; *Steffel v. Thompson,* 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505 (1974); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973).

### 3.

■ This lawsuit was essentially filed to challenge an IEP completed by Defendant's placement committee for Chris in November 1988, for the purpose of placing Chris in the special education class best suited to his needs for the upcoming 1988–89 school year. This IEP was thereafter revised on an annual basis. Thus, the actual IEP being challenged has expired, as has the particular school year for which it was written.

### 4.

Moreover, whereas the November 1988 IEP recommended that Chris be placed in a MOMH program presumably at the middle school level, given Chris' age at the time, the parties do not dispute that that exact placement—in a MOMH program at the *middle school* level—would in fact at present be inappropriate due to the fact that Chris will matriculate to high school this year. Thus, the parties in effect request this Court to decide the appropriateness of placing Chris in a MOMH program on the *high school* level, which exact placement presumably was neither anticipated by nor recommended in the November 1988 IEP.

### 5.

As a result, this Court has expressed its concerns, first, that there is no surviving "case or controversy" for this Court to decide, and second, that the parties are requesting the Court to overstep its proper role in essentially rewriting Chris' November 1988 IEP.

### 6.

With regard to this Court's "case in controversy" concern, it is clear that this Court may exercise jurisdiction in cases where the conduct complained of is "capable of repetition, yet evading review." *Honig,* 484 U.S. at 318, 108 S.Ct. at 601; *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982). In *Murphy,* the Supreme Court further held that " 'in the absence of a class action, the "capable of repetition, yet evading review" doctrine [is] limited to the situation where two elements combine[ ]: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.' " *Murphy,* 455 U.S. at 482, 102 S.Ct. at 1183 (quoting *Ill. Elections Bd. v. Socialist Workers Party,* 440 U.S. 173, 187, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (1979); *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)).

### 7.

The Court finds that the two requirements enumerated in *Murphy* have been met in the present case. Moreover, the Supreme Court in *Honig* found that in cases brought pursuant to the EHA, in which there exists a danger that the student will again suffer the deprivation of rights mandated under the EHA, a Court should exercise jurisdiction to hear the matter under the "capable of repetition, yet evading review" rule. *Honig,* 484 U.S. at 318, 108 S.Ct. at 601. *See also, DeVries v. Spillane,* 853 F.2d 264, 268 (4th Cir.1988) (although IEP upon which suit had been brought had been superseded by another IEP, the previously-filed EHA suit was not moot, because conduct complained of was "capable of repetition, yet evading review") ("*Honig* made clear that EHA cases are classic cases for application of the 'capable of repetition, yet evading review' rule.").

### 8.

Furthermore, due to the EHA's unique "stay put" provision as found in 20 U.S.C. § 1415(e)(3), Chris remains in the MIMH program pending resolution of this dispute.

As a result, the original "controversy"—that is, the question of the proper placement of Chris—remains active. It is also noteworthy that in fact neither of the two subsequent revisions of Chris' IEP specifies "mild" or "moderate" placement. This lack of specificity in the committee's most recent placement recommendations is presumably due to the IEP's having been revised while the EHA's "stay put" provision was in effect, thus mandating Chris' placement in the mild program pending resolution of this dispute. While Chris' IEP dated June 1, 1990 merely lists, under "Recommended Services", " 'Stay–Put'—Mentally Handicapped Program", Chris' most recent IEP, dated March 24, 1991, likewise lists, under "Recommended Services", "Mentally Handicapped—self-contained".

### 9.

■ With regard to this Court's proper role in this matter, it is clearly not the role of a reviewing Court in these circumstances to rewrite the IEP in question. *See Todd D. v. Andrews,* 933 F.2d 1576, 1576 (11th Cir.1991) ("District Court overstepped its role by requiring IEP to be rewritten to permit out-of-state placement of handicapped child"). Rather, the Court is limited to a *de novo* review of the regional and state hearing officers' findings with regard to the most appropriate implementation of Chris' IEP, *as that IEP is written.*

### 10.

In the present case, Chris' November 1988 IEP recommends that Chris be placed in a MOMH program; nothing more. The IEP specifically recommends neither that this placement be implemented in any specific school or at any specific level, nor that it be accomplished in any particular manner. It simply reflects the committee's view that Chris' long range and short term goals, as enumerated in the IEP itself, would best be accomplished through placement in a MOMH program. The mere fact that the location of Defendant's MOMH services dictates that Chris, in order to be placed in the MOMH program, must necessarily attend a particular school in a particular neighborhood is of no consequence.

**11.**

Thus, the Court finds that in reviewing the regional and state hearing officers' findings with regard to the appropriateness of the committee's recommendation *that Chris be placed in a MOMH program*, the Court does not overstep its role by rewriting the IEP, as was the case in *Todd D.*, cited *supra*. In *Todd D.*, the district court required the IEP team to change the goals which the team had previously determined to be appropriate for the student in that case. Upon review, the Eleventh Circuit found that the district court had overstepped its role by requiring the IEP to be rewritten. In contrast, this Court is merely being asked to determine in which of Defendant's special education programs Chris' IEP, *as written*, may appropriately be implemented so as to satisfy Chris' rights under the EHA to a "free appropriate public education."

**12.**

Thus, the Court concludes that it may exercise jurisdiction over this matter. First, this case presents an "actual case or controversy" for decision due to application of the Supreme Court's "capable of repetition, yet evading review" rule and by virtue of the EHA's "stay put" provision. Second, the parties do not ask the Court to overstep its role by rewriting Chris' IEP, since the IEP makes only a general recommendation that Chris be placed in Defendant's moderate program. Rather, the parties simply ask the Court to determine in which of Defendant's special education programs Chris' November 1988 IEP, *as written*, may be appropriately implemented.

## II. *Placement Question*

**13.**

The EHA guarantees to all handicapped children "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs...." 20 U.S.C. § 1400(c). The Supreme Court has held that "[i]mplicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be suffi-

cient to confer some educational benefit upon the handicapped child." *Hendrick Hudson Dist. Bd. of Ed. v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 3047, 73 L.Ed.2d 690 (1981).

**14.**

The Court in *Rowley* further held:

[A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

*Id.* at 206–7, 102 S.Ct. at 3050–51.

**15.**

The Court in *Rowley* further held that the EHA guarantees the child only a "basic floor of opportunity", *Id.* at 200–201, 102 S.Ct. at 3048, that is, "education which confers some benefit." *Todd D.*, 933 F.2d at 1580 (citing *Rowley* ).

**16.**

The Court is mindful in this case of the limited nature of its review of the findings of a committee of handicapped education specialists with regard to the most appropriate educational placement of a child with Down's Syndrome. In such cases,

courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child.

*Id.* at 207, 102 S.Ct. at 3051. In concluding that "it seems highly unlikely that Congress intended courts to overturn a State's choice of appropriate educational theories in a proceeding conducted pursuant to § 1415(e)(2)", the Court reiterated its previ-

ously stated view "that courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Id.* at 207–8, 102 S.Ct. at 3051–52 (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 42, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973)). Finally, the Court stated that "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Id.* 458 U.S. at 208, 102 S.Ct. at 3052. Furthermore, the Eleventh Circuit held in *Todd D.* that "the district court must pay great deference to the educators who develop the IEP." *Todd D.*, at 1580.

### 17.

■ In challenging the appropriateness of Defendant's recommendation that Chris be placed in a MOMH program, Plaintiff contends that placement in *either* the MIMH program *or* in the MOMH program satisfies the requirements of the EHA and *Rowley* by providing Chris with a "free appropriate public education" which "confers some educational benefit" upon him. However, Plaintiff further contends that the EHA also requires that such a free appropriate public education be provided in the "least restrictive environment", as is required by 20 U.S.C. § 1412(5)(B) ("[T]o the maximum extent appropriate, handicapped children ... [shall be] educated with children who are not handicapped...."). Plaintiff evidently argues that under § 1412(5)(B), Chris should be educated in as "mainstreamed" an environment as possible. Finally, Plaintiff points to the fact that Norcross High School, which Chris would attend if placed in the MIMH program, is approximately five miles closer to his home than Duluth High School, which Chris would attend if placed in the MOMH program. Thus, contends Plaintiff, placement of Chris in the MOMH program at Duluth High School, as Defendant recommends, would neither provide Chris with a "free appropriate public education" *in the "least restrictive environment"* as is required by the EHA, nor allow Chris to attend his home, or neighborhood, school.

### 18.

At the outset, the Court disagrees with Plaintiff's contention that in this case placement in *either* the MIMH *or* the MOMH is appropriate for Chris. In light of the evidence in the record and the testimony presented at trial, the Court is unable to conclude that Chris' current placement in the MIMH program provides him with an "appropriate public education" as is required by the EHA. As was stated before, an "appropriate" education has been defined as one designed to confer *some* educational benefit upon the child. The Court is aware of the general rule enunciated in *Rowley*, that "the EHA does not require that the educational services offered by the state maximize the child's potential", *Rowley*, 458 U.S. at 199, 102 S.Ct. at 3047, or indeed that the child must emerge from public education on an intellectual and academic par with his non-handicapped peers.

### 19.

Nevertheless, the Court finds that to state in the present case that Chris has derived "some", though indisputedly not much, educational benefit from the MIMH program would be to engage in mere semantics with the end result of frustrating the purpose behind the EHA, that purpose being the appropriate education of the handicapped. As was testified to numerous times during the trial of this case, Chris may be said to have derived "some" benefit from the mere exercise of dressing himself and sitting in class every day. However, in order to further the purposes of the EHA, this Court finds that a proposed placement must confer some *appreciable* educational benefit upon the child in question.

### 20.

The Court finds that the MIMH program has failed to do this in Chris' case. According to the trial testimony of numerous expert witnesses who have both worked with and observed Chris during the past four years, Chris has in fact made little progress during his four years in the

MIMH program, and would be better served by a placement in Defendant's MOMH program.

21.

During the course of the trial, the court heard testimony from numerous experts in the field of special education, as well as from several of Chris' present and potential teachers employed in Defendant's special education program. Specifically, the Court heard testimony from Dr. Jon Saulson, coordinator of Defendant's MIMH program; Ms. Carol Quinn, lead teacher in Defendant's MOMH program; Ms. Barbara Tillman, Chris' classroom teacher in Defendant's mild program for the past three years at Summerour Middle School; Mrs. Perrine Patrick, classroom teacher in Defendant's mild program at Norcross High School; Dr. Richard Downey, Defendant's Coordinator of Special Education; Dr. Peter Thomas, an Atlanta psychologist who evaluated Chris; and Mrs. Peggy Todd, director of the Supported Training Rehabilitative Instruction Vocational Education ("STRIVE") program at Duluth High School.

22.

The testimony of the above experts overwhelmingly established the following facts. First, Chris is not at present being appropriately served in the mild program, and indeed has made little intellectual and academic progress in the past eight years. Rather, Chris' level of disability, which is higher than that of the other students in the MIMH program, requires that his teachers create an artificial "class within a class" due to Chris' consistent inability to perform the tasks performed by the rest of the students. This has resulted in Chris' being taught in an isolated manner within his own classroom, with Chris not interacting with his classmates in any significant educational fashion.

23.

Second, while his peers in the mild classroom currently function, on the average, at a fifth or sixth grade level, Chris continues to function at a first or pre-first grade level. In fact, Chris is currently working on many of the same objectives outlined for him by the Dekalb County School District in 1983, when Chris was approximately eight years old.

24.

Third, students currently enrolled in Defendant's moderate program are working at a level considerably more advanced than Chris.

25.

Fourth, of the only three children in the Pickneyville mild program with Chris who were at one time functioning at the same level as Chris, all three subsequently have been placed in Defendant's moderate program at Duluth High School. Moreover, all three are currently functioning, in many areas, at a level considerably above Chris' level.

26.

Fifth, expert testimony presented during trial established that Chris would be better served in Defendant's moderate program, and that that would be a more appropriate placement for him.

27.

Sixth, the expert testimony established that if Chris were placed in the mild program at Norcross High School, as Plaintiff wishes, that he would again be isolated from his classmates due to the necessity that he receive individual classroom instruction, and that Chris would not fit in or be accepted by his classmates, and would suffer from a loss of self esteem.

28.

Finally, the trial testimony established that placement of Chris in the mild program at Norcross High School, as Plaintiff wishes, would impermissibly require the rewriting of goals reflected in Chris' November 1988 IEP, since those goals indisputedly are of a moderate nature.

29.

Plaintiff provided no live expert testimony to counter that provided by Defendant. Plaintiff's only live witnesses were Plaintiff herself and a personal friend of Plaintiff's and Chris'. First, Plaintiff testified with regard to her belief that Chris has learned a sufficient number of day-to-day

survival skills through such tasks as helping Plaintiff in her store and doing chores around home. Plaintiff further testified that she believes that Chris would not be sufficiently challenged or exposed to a sufficient number of academic and social situations in the moderate program.

30.

Plaintiff's only additional witness was Martin Swafford, Assistant Chief of Police with the Norcross Police Department. Mr. Swafford, a personal friend of Plaintiff's and Chris', testified that Chris is socially well adjusted and is able to do things easily with other non-handicapped children his own age.

31.

Neither Plaintiff nor Mr. Swafford has been formally trained in the education of the handicapped.

32.

With regard to expert evaluation of Chris, Plaintiff relied heavily upon the deposition testimony of Dr. Mary Ann Drake, a psychologist specializing in childhood special education. Over a period of approximately three hours on one occasion, Dr. Drake performed various tests on Chris in order to determine his intellectual and academic capacities, his particular personality traits, and specific numerical scales such as Chris' I.Q.

33.

In her deposition, Dr. Drake expressed her concern about the long term implications for Chris of his being "labelled" moderately mentally handicapped at this point. Dr. Drake also expressed her belief that a handicapped child would be more stimulated if placed in a class which was slightly ahead of the child academically and intellectually, and would as a result be pushed to learn more at a faster rate.

34.

Nevertheless, Dr. Drake also made several statements which are not necessarily in Plaintiff's favor. First, Dr. Drake recognized that handicapped children often reach a level of academics, beyond which they simply cannot go, with the result that a teacher or parent trying to push in that direction will simply become frustrated, as will the child himself. Second, Dr. Drake outlined what she saw as desirable educational goals for Chris—goals which stressed, over advanced academics, independent living, self-sufficiency and basic survival skills. Although Dr. Drake disapproves of the specific "moderately mentally handicapped" label, those are the very goals which Defendant's witnesses testified Defendant seeks to implement in its moderate program. Third, Dr. Drake admitted that she is not at all familiar with the Gwinnett County system, its various special education programs, or what they offer to students enrolled therein. Fourth, in concluding that Chris behaves normally for a sixteen-year-old child, Dr. Drake relied entirely upon Plaintiff's statements to that effect. Thus, while Dr. Drake clearly opposes Defendant's intended "labelling" of Chris as moderately mentally handicapped, she, having closely evaluated Chris, outlined for him specific optimal goals which appear to be in fact very much in line with the goals of Defendant's moderate program, with which Dr. Drake herself is completely unfamiliar.

35.

Thus, the Court finds the overwhelming evidence to point to the conclusion that the only appropriate placement for Chris, that is, the only placement which will confer upon him some appreciable educational benefit, is in the MOMH program as was recommended by Defendant's 1988 IEP committee. In fact, any educational professional who has ever evaluated Chris for the purposes of his placement, with the exception of Dr. Drake, has recommended placement in the moderate program as the only appropriate placement for Chris at this time. Moreover, although Dr. Drake opposed the use of the label "moderately mentally handicapped", she nevertheless proposed as the most appropriate educational goals for Chris goals which are very much in line with those implemented in Defendant's moderate program.

36.

The Court further finds that Chris has already spent four years in the MIMH pro-

gram, from which he has derived little, if any, appreciable benefit.

### 37.

As a result of these findings, the Court agrees with the conclusions of the regional and state hearing officers that the MOMH program is in fact the most appropriate for Chris.

### 38.

Defendant is directed to implement, as soon as possible, the placement of Chris in Defendant's moderate program at Duluth High School, as was first recommended in Chris' November 1988 IEP.

So ORDERED.